# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Muna Jama, | Case No. 23-CV-03075 (JMB/SGE) |
| Plaintiff, | |
| v. | **ORDER** |
| Colette Peters, *Director of the Federal Bureau of Prisons, in her official capacity, only*; Andre Matevousian, *Regional Director of North Central Region, Federal Bureau of Prisons, in his individual and official capacity*; Warden Michael Segal *of FCI Waseca, in his individual and official capacity*; John Doe, *Officer at FCI Waseca, in his individual capacity, only*; and Officers X and Y *at FCI Waseca, in their individual capacity only*, | |
| Defendants. | |

Alec Shaw, CAIR Minnesota, Minneapolis, MN; Deborah Golden, *pro hac vice*, The Law Office of Deborah M. Golden, Washington, DC; Lena Fatina Masri, *pro hac vice*, Zanah Ghalawanji, *pro hac vice*, Justin Sadowsky, *pro hac vice*, and Gadeir Ibrahim Abbas, *pro hac vice*, CAIR Legal Defense Fund, Washington, DC, for Plaintiff Muna Jama.

Gregory G. Brooker, United States Attorney's Office, Minneapolis, MN; Allison Walter, *pro hac vice*, and Simon Gregory Jerome, *pro hac vice*, Department of Justice-Civil Division, Washington, DC, for Defendant Colette Peters.

Gregory G. Brooker, United States Attorney's Office, Minneapolis, MN; Allison Walter, *pro hac vice*, Simon Gregory Jerome, *pro hac vice*, and Brian J. Boyd, *pro hac vice*, Department of Justice-Civil Division, Washington, DC, for Defendants Andre Matevousian and Warden Michael Segal.

Gregory G. Brooker, United States Attorney's Office, Minneapolis, MN; and Simon Gregory Jerome, *pro hac vice*, Department of Justice-Civil Division, Washington, DC, for Defendants John Doe and Officer X and Y.

1

This matter is before the Court on two motions to dismiss Plaintiff Muna Jama's claims against the Federal Bureau of Prisons (BOP) and several of its officers (together, the Defendants) for alleged violations of the Religious Freedom Restoration Act (RFRA), 42. U.S.C. § 2000bb.  One motion concerns Jama's allegations against Defendants Colette Peters, Andre Matevousian, and Warden Michael Segal in their official capacities (together, the Official Capacity Defendants).  (Doc. No. 58.)  The second relates to Jama's allegations against Matevousian, Segal, and other unnamed officers in their individual capacities (together, the Individual Capacity Defendants).  (Doc. No. 53.)  For the reasons explained below, the Court denies the Official Capacity Defendants' motion, and grants the Individual Capacity Defendants' motion.

## BACKGROUND

### A. Jama's Incarceration

Jama is a practicing Muslim who is incarcerated at FCI Waseca.  (Doc. No. 1 [hereinafter, "Compl."] ¶ 36.)  In accordance with her religious practices, Jama has worn a hijab (a head covering that covers her hair, ears, and neck) since childhood and does not willingly appear in public spaces without it.  (*Id.* ¶¶ 23, 24, 25.)  Jama wears her hijab in all mixed-gender spaces that include more than the members of her immediate family.  (*Id.* ¶ 26.)  To be seen without her hijab by strangers is "a serious breach of [her] faith and a deeply humiliating and defiling experience," and in violation of her religious practices.  (*Id.* ¶¶ 26, 27.)

In 2019, when Jama arrived at FCI Waseca, she was ordered to have her identification picture (booking photo) taken.  (*Id.* ¶ 36.)  Jama explained to officers that she

wears a hijab in accordance with her religious beliefs and that she wished to wear it in her booking photo. (*Id.*) Defendant John Doe, who was taking the photo, would not allow it. (*Id.*) Doe threatened Jama with solitary confinement if she did not cooperate. (*Id.*) Jama relented, and Doe photographed Jama without her hijab. (*Id.*) That photo, which shows Jama without her hijab, was used on her prison ID card. (*Id.*)

Inmates at FCI Waseca must carry their ID cards at all times. (*Id.* ¶ 37.) The cards are used to identify inmates during headcounts, at commissary, at mealtimes, and at checkpoints throughout the facility. (*Id.* ¶¶ 37–39.) Each time Jama swiped her ID card, her booking photo—which showed an image of her without her hijab—appeared on the database's screen and was visible to all within the vicinity. (*Id.* ¶ 39.) Jama's booking photo also appeared in the physical book that both male and female officers referenced during bed count. (*Id.* ¶ 38.) Jama's booking photo was also displayed on her locker, which was where she stored projects she worked on as part of the programming offered to inmates and was visible to anyone who may have passed by. (*Id.* ¶ 40.)

On July 7, 2022, Jama filed an informal resolution complaint with BOP, in which she alleged that the act of taking a photo of her without a hijab, the booking photo's existence in the facility's database, and the required use of the ID card throughout the facility violated her religious rights. (*Id.* ¶ 41.) After complaining, Jama was brought in to have a new photo taken, which she believed would replace her previous booking photo that depicted her without a hijab. (*Id.* ¶ 42.) Defendants Officer X and Officer Y took a photo of Jama with her hijab on. (*Id.* ¶ 43.) The officers subsequently informed Jama that they needed to take another photo of her without her hijab. (*Id.* ¶ 44.) Jama objected to

3

this request. (*Id.*)  The officers told Jama that this was the order they were instructed to follow and threatened her with time in the special housing units, or SHU.  (*Id.*)  Jama eventually relented, and another photo of her without her hijab was taken.  (*Id.*)

Jama again lodged a grievance about having had a photo of her without her hijab taken again.  (*Id.* ¶¶ 45, 46.)  Matevousian personally responded to Jama's grievance; he told her that the second, hijab-less picture was necessary only for security purposes and official BOP records.  (*Id.* ¶ 46.)

Sometime thereafter, Jama lost her ID card and, when issued a new copy, she discovered that it featured the photo in which she was not wearing her hijab.  (*Id.* ¶ 47.)  Later, Jama also noticed that her uncovered photo appeared on the system screen at commissary and on the physical book used to conduct the bed count.  (*Id.* ¶¶ 48, 49.)  She also noticed her uncovered photo was posted on the front of her locker.  (*Id.* ¶ 50.)  Further, she came to find out administrators were viewing a photo of her without her hijab.  (*Id.*)  All of this caused Jama extreme mental anguish, trauma, and emotional distress.  (*Id.* ¶ 72.)

**B.   This Action**

On October 4, 2023, Jama filed this action.  (*See* Compl.)  In her one-count Complaint, she alleges that the BOP and several of its officers have violated her religious rights under RFRA.  (*See id.*)  On January 29, 2024, Jama filed an emergency motion for a preliminary injunction asking this Court to issue an order requiring FCI Waseca to take the following three actions: (1) replace Jama's uncovered photograph in their database with a photograph of Jama wearing her hijab; (2) cease use of the uncovered photograph to identify Jama in her daily activities and programming (e.g., locker, bed counts); and

4

(3) replace Jama's photo ID card to feature a photograph of her in which she is wearing her hijab. (Doc. No. 21; *see also* Doc. No. 22 at 16.)

After meeting and conferring, the parties appeared to have resolved the issues raised in the preliminary injunction motion. On February 1, 2024, FCI Waseca initiated a new waiver[1] for Jama's identification, referred to as a "new dual photograph process." (Doc. No. 61 [hereinafter, "Davis Decl."] ¶¶ 13–16.) Pursuant to the new waiver, a photograph of Jama wearing her hijab would be taken and used for her ID card and in everyday BOP business; and a second photograph of Jama without her hijab would be taken by a female officer and would be "filed away with highly restricted access only to be viewed in the event of Jama's escape." (*Id.* ¶¶ 14, 21.) This dual photograph waiver would be subject to annual review and would be extended "if the conditions supporting the waiver are still valid." (*Id.* ¶ 12.) The parties also entered into a temporary stipulation, which provides, in relevant part, as follows:

> *For the duration of this case, absent exigent circumstances*, FCI Waseca agrees to only use this covered photo. . . .
>
> . . . .
>
> *For the duration of this case*, and to the extent that the covered photo does not automatically replace the uncovered photo, FCI Waseca agrees to cease any non-exigent use of the uncovered photo the parties identify in the future. . . .
>
> . . . .

---

[1] According to Defendants, any deviation from BOP program requirements—such as BOP Program Statement 5800.18, which requires each inmate to have a booking photo that is to be "taken full face front, eyes open, without glasses or head coverings"—requires a formal waiver. (Davis Decl. ¶¶ 5, 11.)

>   FCI Waseca has issued Ms. Jama a new identification card featuring the covered photograph. *For the duration of this case*, FCI Waseca agrees that it will allow Ms. Jama to continue using this new identification card.

(Doc. No. 34 at ¶¶ 1–3 (emphasis added).) In exchange for the above, Jama agreed to withdraw her motion for a preliminary injunction. (Doc. No. 34 ¶ 7.)

## DISCUSSION

RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the burden is "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. 42 U.S.C. § 2000bb–1. A person whose religious freedom has been violated may "assert that violation as a claim . . . and obtain appropriate relief against a government." *Id.* § 2000bb–1(c). Both the Official Capacity Defendants and the Individual Capacity Defendants now move to dismiss Jama's RFRA claim against them. (Doc. Nos. 53, 58.)

### I. THE OFFICIAL CAPACITY DEFENDANTS' MOTION

The Official Capacity Defendants move to dismiss Jama's claim under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, arguing that Jama's claim for injunctive relief has been rendered moot because the Official Capacity Defendants voluntarily ceased the complained-of conduct.[2] (Doc. No. 60.) As discussed below,

---

[2] Defendants also make two additional arguments unrelated to subject matter jurisdiction: (1) that "BOP's retention of the escape photo with restricted access for a limited purpose does not violate RFRA" (Doc. No. 60 at 19); and (2) that the requested permanent nationwide injunctive relief requested is not appropriate (*id.* at 22–27). The Court declines to address these arguments at this time because these arguments go to the merits of the

6

because the complained-of conduct could recur, the Official Capacity Defendants have not carried their burden to establish mootness.

Although plaintiffs typically bear the burden of establishing subject-matter jurisdiction, *e.g.*, *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019), defendants bear a "heavy" burden[3] when arguing that a case or controversy has become moot because of voluntary cessation of complained-of activity. *W. Virginia v. EPA*, 597 U.S. 697, 719 (2022). When resolving a factual attack to subject-matter jurisdiction under Rule 12(b)(1), as here, courts may consider matters outside of the pleadings, such as uncontested factual allegations in sworn declarations. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016); *see also Fikre*, 601 U.S. at 236 (accepting "as true the supplemental evidence the government offered," which included declarations from government officials).

The Constitution limits federal courts' jurisdiction to actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Davis v. Anthony, Inc.*, 886 F.3d 674, 677 (8th Cir. 2018) (quotation omitted). This can occur, for

---

FRFA claim, not its justiciability. *Accord Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 812 (10th Cir. 2022).

[3] The Official Capacity Defendants cite *Prowse v. Payne*, 984 F.3d 700 (8th Cir. 2021) for the proposition that the Government has a lower burden of persuasion under the voluntary cessation theory. (*See* Doc. No. 60 at 12–13 (quoting *Prowse*, 984 F.3d at 702–03).) The Supreme Court's decision in *Federal Bureau of Investigations v. Fikre*, 601 U.S. 234, 241 (2024), however, establishes that this language from *Prowse* is no longer good law.

example, when "a complaining party manages to secure outside of litigation all the relief he might have won in it . . . , a federal court must dismiss the case as moot." *Fikre*, 601 U.S. at 240.  When, in such a case, a defendant changes its practices such that a plaintiff obtains the requested relief, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted).  To be clear, "a defendant's voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur." *Fikre*, 601 U.S. at 241 (quotations omitted); *see also Friends of the Earth*, 528 U.S. at 189 (noting that voluntary cessation does not moot a case when the defendant is "free to return to his old ways" (citation omitted)).

The Official Capacity Defendants argue that, based on the parties' stipulation and the dual photograph waiver, there is no case or controversy left to adjudicate because "Jama is not experiencing, and will not experience in the future, the harms she alleges in her Complaint" and "[t]his is not a case where the alleged unlawful behavior could reasonably be expected to recur." (Doc. No. 60 at 12, 15.)  However, the Court is not persuaded for three reasons: (1) the Official Capacity Defendants have not explained how the dual photograph waiver will be more certain to prevent recurrence of the challenged conduct than the initial waiver; (2) the dual photograph waiver is subject to annual review based on unknown criteria and conditions, and (3) the dual photograph waiver fails to remedy the harm alleged in the Complaint in relation to the BOP's continued retention of her uncovered photograph.

First, Jama alleged that, although she received an initial waiver to the BOP's policy after filing a grievance, this initial waiver did not prevent the challenged conduct from recurring. (*See* Compl. ¶¶ 42, 45, 48–50.) The Official Capacity Defendants do not offer any explanation or argument why the initial waiver was not followed. Instead, the Official Capacity Defendants explain only that the current dual photograph waiver was spurred by litigation: they state that, "[i]n light of this litigation," a new waiver request "was sent to the Assistant Director," and BOP adopted a new "dual photograph process" beginning on February 1, 2024. (Davis Decl. ¶¶ 13–16.) The Official Capacity Defendants have failed to explain why litigation had a different result than Jama's initial grievance. *See Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (explaining that voluntary cessation that occurs because of litigation "must be viewed with a critical eye").

Second, the current dual photograph waiver is expressly subject to change or expiration. The Official Capacity Defendants concede that "[w]aivers are reviewed annually," but note that waivers are extended only "if the conditions supporting the waiver are still valid." (Davis Decl. ¶ 12.) In addition, the Official Capacity Defendants assert that, because "Jama's religious objection to being viewed by non-familial men without her head covered will persist," the Official Capacity Defendants expect Jama's waiver "will be extended." (Doc. No. 69 at 7.) The record presented, however, contains no evidence pertaining to how the BOP determines the ongoing value of conditions supporting a waiver. Likewise, the record does not include evidence concerning what conditions besides the existence of Jama's stated religious objection would be considered in the review of the current dual photograph waiver. In *Fikre*, the defendant asserted plaintiff's grievance about

9

being placed on a no-fly list was moot because it had represented that it would not place him on such a list based on "currently available information"; however, the Supreme Court determined that was insufficient to establish mootness because there was no record evidence relating to what could become "available information" in the future. 601 U.S. at 242–43. Here, the Official Capacity Defendants similarly identify no evidence to support their assertion that the dual photograph waiver will be extended or that explains what conditions would be considered when the BOP reviews it.

Third and finally, this case is not moot because the Official Capacity Defendants still maintain images of Jama without her hijab. (Davis Decl. ¶ 15.) Jama's RFRA claim centers around her concern that being viewed by strangers without a head covering is "a serious breach of [her] faith and a deeply humiliating and defiling experience in conflict with her sincerely held religious beliefs." (Compl. ¶ 27.) Jama requests an order requiring the Official Capacity Defendants to destroy photographs and security-camera footage of her without a hijab. (*See id.* at 17; *see also id.* ¶ 60 ("This action aims to have Mrs. Jama's illegally captured photographs and security footage destroyed.").) The current dual photograph waiver does not address the destruction of existing photographs. (*See* Davis Decl. ¶¶ 14, 16, 17; Doc. No. 34.) Even the possibility of a partial remedy—here, for example, the requested destruction of existing images—is sufficient to prevent a case from being moot. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12–13 (1992); *see also Rezaq v. Nalley*, 677 F.3d 1001, 1010 (10th Cir. 2012) ("A case is not moot when there is some possible remedy, even a partial remedy or one not requested by the plaintiff."); *see also Chaaban v. City of Detroit*, No. 20-CV-12709, 2021 WL 4060986, at

10

\*4 (E.D. Mich. Sept. 7, 2021) (concluding female Muslim prisoner's request for injunctive relief related to defendant's use of hijab-less photo was not moot because defendant left open the possibility that it could keep a hijab-less photo in its administrative files, which could be viewed by male staff).

For these reasons, the Court concludes the matter is not moot, and therefore denies the Official Capacity Defendants' motion to dismiss.

## II.   THE INDIVIDUAL CAPACITY DEFENDANTS' MOTION

The Individual Capacity Defendants[4] move to dismiss the RFRA claim under Federal Rule of Civil Procedure 12(b)(6), arguing that they are entitled to qualified immunity.[5]  (Doc. No. 54 at 21–32.)  Because Jama has not identified a clearly established right that the Individual Capacity Defendants allegedly violated, the Court grants the motion.

On a motion to dismiss under Rule 12(b)(6), courts consider all facts alleged in the complaint to be true and then determine whether the complaint states a "claim to relief that

---

[4] Matevousian also moves to dismiss the claims raised against him in his personal capacity, arguing that the Court lacks personal jurisdiction over him.  (Doc. No. 54 at 15–21.)  The Court assumes without deciding that it has personal jurisdiction over Matevousian for the purposes of considering the motion to dismiss on qualified immunity grounds.

[5] Jama does not contest the proposition that qualified immunity is a defense to individual capacity claims under RFRA.  At least one recent Supreme Court opinion considered qualified immunity as a defense to RFRA.  *Tanzin v. Tanvir*, 592 U.S. 43, 51 n.2 (2020) ("Both the Government and respondents agree that government officials are entitled to assert a qualified immunity defense when sued in their individual capacities for money damages under RFRA.").  Because Jama makes no contrary argument to the contrary, and in light of the analysis in *Tanzin*, the Court considers qualified immunity as a defense to RFRA claims.

is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In this analysis, courts construe the allegations and draws inferences from them in the light most favorable to the plaintiff. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018).

Under the doctrine of qualified immunity, courts conduct a two-pronged analysis: it asks "[1] whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right and [2] whether the right was clearly established at the time of the alleged infraction." *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In this case, the Court will begin with the second prong—whether the claimed right was clearly established.

For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The state of the law at the time of the alleged violation must give officials "fair warning their conduct was unlawful." *Sisney v. Reisch*, 674 F.3d 839, 845 (8th Cir. 2012) (quotation omitted). Jama has failed to point to binding authority which would have given defendants a fair warning that their enforcement of the generally applicable identification policy violated Jama's rights under RFRA. To the contrary, other courts addressing this and similar issues have concluded that the Constitution did not clearly prohibit conduct similar to that alleged here. *See, e.g., Taylor v. Nelson*, No. 20-51051, 2022 WL 3044681, at *2 (5th Cir. Aug. 2, 2022) (per curiam)

12

(granting qualified immunity to prison officials who enforced a facially neutral policy against the plaintiff because the policy was not "facially outrageous" and "reasonable officials would not have understood that enforcing the hijab policy was unconstitutional" (citations omitted)); *Butler-Bey v. Frey*, 811 F.2d 449, 451 (8th Cir. 1987) (concluding defendant's prohibition of religious headgear in the prison visiting room, dining room, chapel, and school was reasonable); *Rogers v. Scurr*, 676 F.2d 1211, 1215–16 (8th Cir. 1982) (concluding that there was no clearly established right to wear prayer caps and robes outside of religious services); *Al-Kadi v. Ramsey Cnty.*, No. CV 16-2642 (JRT/TNL), 2019 WL 2448648, at *13 (D. Minn. June 12, 2019) (concluding that there was no clearly established right to wear a hijab for purposes of a booking photo); *Daywitt v. Minnesota*, Civ. No. 14-4526 (MJD/LIB), 2015 WL 4094199, at *9 (D. Minn. July 6, 2015) (concluding that there was no clearly established right to wearing religious apparel (suitcoats and yarmulkes) in a Minnesota state prison facility); *Pittman v. Jesson*, No. 12-CV-1410 (SRN/TNL), 2014 WL 4954286, at *24–25 (D. Minn. Sept. 30, 2014) (concluding that there was not clearly established right to wear a Kufi at all times in a Minnesota state prison facility).

Given these holdings, the Court concludes that the removal of Jama's hijab for booking photos and identification did not violate a clearly established religious right. Thus, the Individual Capacity Defendants are entitled to qualified immunity.[6]

---

[6] Because an official is not entitled to qualified immunity unless both prongs are satisfied, a court's analysis will end if either of the two is not met. Here, the Court concludes that the second prong is unsatisfied and declines to address the first prong.

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. The Official Capacity Defendants' Motion to Dismiss (Doc. No. 58), is DENIED.

2. The Individual Capacity Defendants' Motion to Dismiss (Doc. No. 53), is GRANTED.

Dated: October 7, 2024                     /s/ *Jeffrey M. Bryan*
                                           Judge Jeffrey M. Bryan
                                           United States District Court